**In re Claude C. RANCOURT, and Matriarch, Inc., Debtors.**

**Bankruptcy Nos. 90–11957, 90–11961.**

United States Bankruptcy Court, D. New Hampshire.

Feb. 7, 1997.

**340**

Steve Ellis, Michael J. Pappone, Goodwin, Procter & Hoar, Boston, MA, for DIP/Debtors.

Robert M. Walsh, Hunter & Walsh, Boston, MA, for Special Committee.

Douglas Gooding, Paul D. Moore, Choate, Hall & Stewart, Boston, MA, for Creditor's Committee, Chapter 11 Trustee.

John R. Michels, Michels & Michels, Londonderry, NH, for Special DIP Professionals.

Geraldine Karonis, Office of the US Trustee, Manchester, NH, Asst. US Trustee.

### MEMORANDUM OPINION ON FINAL FEE AWARDS TO DEBTORS' COUNSEL AND GENERAL CREDITORS' COMMITTEE COUNSEL

JAMES E. YACOS, Chief Judge.

The Court by separate Order this date has acted upon a number of pending requests for final fee awards by the professionals involved in this chapter 11 proceeding which resulted in a liquidating plan presented by the chapter 11 trustee. (A copy of the "Order on Final Fee Awards" is attached as an Annex to this Opinion). This Memorandum Opinion explains in further detail the reasons which led the Court in the aforesaid Order to substantially reduce the requested fee compensation to the debtors' attorneys who were appointed to represent the debtors-in-possession in these proceedings, and to reduce to a lesser extent the fee compensation requested by the attorneys appointed to represent the General Creditors' Committee who acted during the course of the chapter 11 proceedings prior to the appointment of a chapter 11 trustee. The separate Order grants the requested reimbursement for necessary and proper expenses by these applicants in the amounts requested. The present opinion deals only with their requests for final *fee* awards.

### FEE AWARDS AND ISSUES

The application for final fee award by the debtors' attorneys, Goodwin, Proctor & Hoar, of Boston, Massachusetts, requested a final fee award of $919,682.00. (Ct. Docket No. 978). Goodwin, Proctor & Hoar filed a Memorandum in support of their application for fees on August 12, 1996. (Ct. Docket No. 1067). The Court by the separate Order has allowed $460,000 as a final fee award to these attorneys. After crediting a total of $442,600 in interim fee allowances during the course of the chapter 11 proceeding, the effect of the Order is to authorize an additional $17,400 in fee compensation to be paid to these attorneys at this time in accordance with the final fee award granted.

The application for final fee award by the attorneys appointed to represent the general creditors' committee, Choate, Hall & Stewart of Boston, Massachusetts, requested a final fee award of $145,792.75 (Ct. Docket No. 982). The Court by the separate Order has allowed $120,000 as a final fee award to these attorneys. After crediting a total of $120,000, there are no further fees to be paid at this time.

The final fee application in question by the debtors' attorneys provoked strenuous objections by the United States Trustee and objections by the Federal Deposit Insurance Corporation (FDIC), the major unsecured creditor in these proceedings. (Ct. Docket Nos. 1029, 1024, 1073, and 1072). The final fee application by the referenced creditors' committee's counsel generated a "Response of United States Trustee" (Ct. Docket No. 1031), which requested that the Court defer allowance of any further compensation to these attorneys until a satisfactory explanation was obtained as to what steps if any the attorneys took prior to the initial authorization of environmental remediation expenditures on the 44 Broad Street property to determine whether the site involved actually presented an "imminent and present" actual danger to public health and safety that would have precluded abandonment under applicable case law. The attorneys filed a "Reply to Response of United States Trustee" (Ct. Docket No. 1057), which the United States Trustee indicated at the hearing on

the fee applications satisfied her concern and she withdrew her objection to the full allowance of this final fee award request. The reply by these attorneys however refers only to a conditional and unrealistic objection to the initial expenditure of environmental remediation funds that could be deemed a "straddling position" inappropriate to the full performance of their duties to ensure the maximum dividend to the general unsecured creditors, from whose pocket the expenditures would be made, and therefore the Court has deemed it appropriate to consider the issue further with regard to this final fee request notwithstanding the withdrawal of the objection by the United States Trustee.

The United States Trustee's objections to the application by debtors' counsel include reference to apparent over-staffing by the law firm but the primary objection relates to the activities of the attorneys with regard to a property located at 44 Broad Street, in Nashua, New Hampshire, which was subject to various assertions of toxic waste danger by the Environmental Protection Agency (EPA). The United States Trustee contends that the attorneys were involved in a clear conflict between the interests of the debtors personally and the interests of the estate with regard to how to treat the claims by the EPA. Accordingly, the United States Trustee contends that not only should all further compensation be denied but that the creditors' trustee appointed under the liquidating plan should be instructed to pursue possible recovery and disgorgement of fees previously paid for services which arguably resulted in excessive and unnecessary expense in resolving the dispute with the EPA. The United States Trustee also notes that fees of $209,712.20 were incurred by other professionals retained by the debtors-in-possession, including two sets of special counsel, a financial consultant, and an accountant, for services rendered prior to the appointment of the chapter 11 trustee on December 5, 1991, and that the resulting total claims for profession-

al services to the debtors-in-possession, of $1,129,394.20 is simply inappropriate and unreasonable in terms of the size of this estate and the results obtained which did not result in a reorganization plan but rather a liquidating plan by a chapter 11 trustee.

The FDIC in its objections to the application by debtors' counsel contends that this case "is essentially a failed effort of reorganizing the affairs of Claude C. Rancourt" and notes that a total of eight related cases were filed in October 1990 and that within five weeks six of the cases had either been converted to chapter 7 or voluntarily dismissed. The FDIC notes further that the two remaining debtors filed a plan of reorganization and disclosure statement in July of 1991, but that plan was never confirmed and the disclosure statement was never approved. The FDIC joins in the assertion of over-staffing, noting that 52 separate persons at the law firm charged time to the case, and questioning with regard to time entries of 19 hours on June 25, 1991 and 22.5 hours on July 17, 1991 by one of the associate attorneys of the law firm "how effective Mr. Ellis' efforts could have been in the 21st and 22nd hour of his day on July 17 for example."

█ Since the major issue raised by this record as to these applications concerns the assertions of conflict and/or unproductive services—or even counter-productive services—by these attorneys relating to the activity of the debtor Rancourt[1] as to the 44 Broad Street property, the Court has undertaken a laborious review of the entire record of this bankruptcy case from the beginning to determine how the 44 Broad Street property actually surfaced and was handled during the course of the proceedings. I have previously acknowledged that "hindsight" has to be scrupulously avoided by a fee-awarding Court, *In re PSNH*, 160 B.R. 404, 408–409 (Bankr.D.N.H.1993), and therefore the reviewing Court must examine the situation "as it then appeared" to make an appropriate determination of reasonable services.

---

1. The debtor Matriarch, Inc. owned none of the real properties held by Rancourt, including the 44 Broad Street Property. Matriarch was organized by Rancourt in 1985 solely for administrative purposes to be "the central vehicle from which Rancourt managed his property interests."

(Ct. Docket No. 439, p. 3). For simplicity therefore, and accuracy for present purposes, in that the attorneys in dealing with the 44 Broad Street property were in fact dealing with "the debtor Rancourt," this Opinion will use "debtor" in the singular unless otherwise expressly indicated.

The Court has done that in the present case and will set forth some of the more pertinent matters of record that bear on the objections to these fees relating to the 44 Broad Street property activity.

## DISCUSSION

The chapter 11 petitions commencing these cases were filed on October 22, 1990. The schedules for debtor Claude Rancourt were filed on November 30, 1990. (Ct. Docket No. 86). The statement of affairs for Claude Rancourt include a reference to "US EPA v. Rancourt" "regarding hazardous waste problem on site at 44 Broad Street, Nashua, New Hampshire." (Ct. Docket No. 86, Exhibit D–2, p. 2). The schedules indicate that 44 Broad Street was purchased in April of 1976 for $280,000 (Ct. Docket No. 86, Exhibit E, Question 13a) and indicate a value for the property of $400,000 (Ct. Docket No. 86, Schedule B) with liens to numerous parties well in excess of that value. An amended statement of executory contracts filed on December 4, 1990 indicates a contract with Geoserve for EPA work on 44 Broad Street giving invoice amounts from September 27, 1990 through November 19, 1990 in excess of $42,000. The last two items on the invoice totaling approximately $20,000 have "purpose" references stating "estimate to complete" and "estimate for interim" for those items. (Ct. Docket No. 94, p. 7).

The EPA first identified asbestos material at the 44 Broad Street site after conducting soil samples of the river bank in November of 1985. In September of 1986, after EPA discussions, the debtor constructed a temporary cover on the site, and on March 30, 1987 the EPA issued an Administrative Order (the "First EPA Order" according to the debtor) requiring the debtor to initiate various remediation activities at the site. By November of 1987, the debtor implemented the necessary response action, and by letter of May 1988 the EPA confirmed that the debtor had complied with the First EPA Order. (Ct. Docket No. 476, pp. 5–7).

On August 27, 1990, before the October 1990 bankruptcy filing, the EPA issued a "Second EPA Order"[2] to Rancourt "requiring him to conduct an investigation of the extent of asbestos contamination at the site and to prepare a plan of further response action to address the contamination." (Ct. Docket No. 439, p. 47). On November 9, 1990, approximately two weeks after the bankruptcy filing, Rancourt submitted a report of investigation of the property prepared by Geoserve, Inc. As a supplement to the November report, Rancourt on January 7, 1991 submitted to the EPA a proposed clean-up plan for the property prepared by Geoserve. On April 12, 1991 EPA provided detailed comments on the GEOSERVE plan to Rancourt and requested that Rancourt make modifications to the plan. (Ct. Docket No. 439, p. 37). After receiving the EPA comments, Rancourt retained Thomas A. Dunne to prepare a revised response plan which was submitted to the EPA on May 28, 1991. On June 5, 1991, the EPA issued a letter to Rancourt requesting further changes be made to the revised plan. Rancourt subsequently met on June 20, 1991 and June 26, 1991 with representatives of the EPA and the U.S. Army Corps. of Engineers to discuss the EPA's requested revisions to the revised plan. As a result of this meeting Rancourt submitted a second revised plan to the EPA on July 8, 1991. After various additional meetings with its consultants and contractors Rancourt submitted a letter to EPA on July 10, 1991 proposing additional revisions to the second revised plan. (Ct. Docket No. 439, p. 48).

None of the foregoing activities by the debtor with regard to the EPA and the 44 Broad Street property were made a matter of record in the chapter 11 proceedings at the time they occurred, nor was any authorization to encumber the estate with the clean-up obligations being agreed to by Rancourt and his attorneys sought from the Court prior to the filing of the Joint Plan of Reorganization in July of 1991 and the filing and the hearing of the "Motion to Authorize Re-

---

**2.** See discussion below regarding a purported "Third EPA Order" in September 1991 that was on occasion also referred to as a "Second EPA Order" engendering some confusion in this record.

medial Expenditures" in September of 1991.[3a]

The joint reorganization plan filed by Rancourt and Matriarch on July 18, 1991 provided that "Class 2—allowed EPA remediation claims" would be paid the full amount of their claims in cash after the effective date and that Rancourt would assume responsibility to pay the Class 2 claims under Article V of the plan. (Ct. Docket No. 440, p. 4). The plan provided that Class 2 was not impaired by the plan "inasmuch as holders of such claims are paid as incurred." (Ct. Docket No. 440, pp. 26–27). The plan provided, in Article V "Means for Implementation of the Plan" and in Section 5.02 "Creation of Matriarch Properties, Inc.," that on the effective date Rancourt would obtain a charter for the new corporation, MPI, "which would assume responsibility for operating and managing the Retained Properties in accordance with the terms of the MPI Management Contract." (Ct. Docket No. 440, p. 28). The "retained properties" were defined as five mobile home parks enumerated in Exhibit A to the plan. (Ct. Docket No. 440). The plan further provided in Section 5.13 "Payment of Class 2 EPA Remediation Claims," that "MPI will pay all Class 2 EPA remediation claims as the remediation costs for the asbestos clean-up (or covering) at 44 Broad Street are incurred or as otherwise agreed to by holders of Class 2 allowed claims in Rancourt" even though the 44 Broad Street property was not to be a retained property under the plan. (Ct. Docket No. 440, pp. 32–33). However, the effect of the foregoing was to have all environmental remediation expenses regarding 44 Broad Street paid from funds that otherwise would be available for the distribution pro rata to unsecured creditors under the plan.

The joint disclosure statement for the debtors' joint plan was filed on July 18, 1991 and provided for the Class 2 treatment described above and referred to payment of the full amount of those claims in cash "after the effective date" as the costs are incurred, etcetera. (Ct. Docket No. 439, p. 22). The plan defined the effective date as the first business day following the date on which the confirmation order became a final order. The effective date was also to be the consummation date of the plan. (Ct. Docket No. 440, p. 10). The joint disclosure statement stated in Section 5(a) regarding 44 Broad Street:

"The debtors shall transfer or abandon 44 Broad Street to Nashua Trust upon the Effective Date. As discussed below, 44 Broad Street is contaminated with asbestos which the Debtors are in the process of remediating. The Debtors' estimate that 44 Broad Street presently has substantial negative value as a result of the asbestos contamination. However, upon completion of their remediation work, the debtors will seek to value 44 Broad Street pursuant to Section 506 of the Bankruptcy Code. The Debtors expect the asbestos contamination to be substantially remediated prior to Confirmation of the Plan."

(Ct. Docket No. 439, p. 37).

Rancourt indicated in the joint disclosure statement of July 18, 1991 that he had submitted clean-up proposals to the EPA regarding the 44 Broad Street property, and that he was "currently awaiting the EPA approval of the Second Revised Plan as modified by the July 10th letter." The joint disclosure statement indicated that current cost estimates for performing the modified second revised plan were "approximately $300,000". It is further noted that, if the EPA were to clean up the site itself, the EPA advised that the cost "could be as much as $798,000". The disclosure statement stated "If such a claim is asserted against these estates, it may be entitled to treatment as an administrative expense priority." (Ct. Docket No. 439, p. 48). The disclosure statement concluded with regard to 44 Broad Street that "The Debtors believe they can remediate the contamination for under $300,000, based on estimates received from environ-

---

3a. The first hearing on the disclosure statement accompanying the July 1991 joint plan was held on September 4, 1991. No mention was made of any EPA problem at that hearing and the matter was simply continued to October 8, 1991 since debtor's counsel indicated the disclosure statement was being amended to react to various objections that had been filed. (Ct. Docket No. 459).

mental contractors and other consultants. If these estimates prove to be inaccurate or unacceptable to the EPA, the clean-up cost for 44 Broad Street may increase, reducing the initial dividend to Unsecured Creditors." (Ct. Docket No. 439, p. 53).[3]

Neither the debtors' joint plan filed in July of 1991 nor the disclosure statement filed simultaneously made any mention of the alternate possibility of attempting to abandon the 44 Broad Street property pursuant to § 554 of the Bankruptcy Code. A First Amended Plan was filed by the debtors on September 16, 1991 (Ct. Docket No. 465) and again provided[4] that the remediation work on the 44 Broad Street property would be performed and paid before "net available income" was determined to define the amount that would be available for pro rata distribution to general unsecured creditors under the plan. And again neither the September 1991 amended plan nor its accompanying disclosure statement (Ct. Docket No. 464) made any mention of the alternate possibility of attempting to abandon the 44 Broad Street property.

On September 16, 1991, the debtor also filed an "Application for Approval of Environmental Remediation Work and for Debtor to Enter Into Contract" (Ct. Docket No. 461) reciting that it had been ordered by the EPA to enter into a contract by September 11, 1991 for remediation work to commence five days thereafter and providing that if the debtor did not begin this work immediately "the EPA will commence the work itself." The motion indicated that the debtor had already entered into a contract with L.R.S. Enviro–Services, Inc. "since the debtor [was] first to commence the remediation efforts immediately" and requested that approval of the motion be made *nunc pro tunc* to the date earlier in September when the debtor entered into that contract. The EPA order

in paragraph 31 states: "The actual or threatened release of hazardous substances at or from the site may pose 'an imminent and substantial endangerment to the public health or welfare or the environment' within the meaning of § 106(a) of CERCLA, 42 U.S. § 9606(a)." (Ct. Docket No. 461, Exhibit A, p. 6). The debtor indicated the need for an expedited hearing and the Court accommodated them by setting a hearing on the motion for September 24, 1991. The motion indicated that the cost for the debtor to conduct the clean-up of the 44 Broad Street site would be approximately $434,000. At the September 24th hearing the debtor through counsel indicated that the cost authorization should be capped at $495,000. It was indicated that the debtor had already expended $56,000 for the two weeks prior to the hearing. (Transcript, 9/24/91, p. 40).

To support their requested relief the debtor attached to the motion as an "Exhibit A" a copy of a "Second [sic] Administrative Order for Removal Action" issued by the EPA. The last page of this document reads "IT IS SO ORDERED. Issued at Boston, Massachusetts this *3rd* day of Sept., 1991." (Cf. reference to "Second EPA Order" dated Aug. 27, 1990 earlier in this Opinion at p. 7). Attached to the copy of the EPA Order is an Appendix which refers to the "Scope of Work" necessary at the 44 Broad Street site. As noted, the EPA Order is dated September 3, 1991 and has the typed "August" stricken. It seems likely that the EPA simply reissued the 1990 order in September of 1991 but attached new work contracts and specifications, etcetera, as set forth in the Appendix, that were negotiated with the debtor following the bankruptcy filing. Whether or not the foregoing is true it is clear that the order entered September 3, 1991 was in truth and fact for all practical purposes a *consent order* obtained by the debtor after the various ne-

---

**3.** This interrelationship between the mounting EPA costs and the possible dividend to unsecured creditors under the plan should have demonstrated to counsel for the debtor at least by this time that the entire EPA matter should have been incorporated in the plan itself rather than submitted for separate authorization and expenditure, even if counsel deemed an attempt to abandon 44 Broad Street problematical.

**4.** This is in fact the effect of what the plan provided—albeit in a somewhat roundabout and convoluted manner. (Ct. Docket No. 464, paragraphs 3.02(b), 3.25(b)(3), 5.05, 5.14, 5.17, 5.19, 5.20, and the accompanying Exhibit A definitions of "Buyout Price," "Distribution Account," "Excess Cash Available," "Net Available Income" and "Trust").

gotiations. The debtor in a Memorandum of September 21, 1991 (Ct. Docket No. 476, p. 10) recites that the debtor submitted various revisions to the EPA right into September of 1991 and states: "After receiving the final such revision, the EPA approved a revised plan by letter dated September 12, 1991." (See Ct. Docket No. 476, p. 10).[5]

The foregoing indicates the negotiated nature of the EPA Order and takes away from the urgent nature of the motion as presented by the debtor to the Court in September of 1991.[6] The debtor further recites in its Memorandum that since the EPA Order became effective on September 9, 1991 it required the debtor to retain the services of a supervising contractor within three days of its effective date and to commit the work required to implement the revised plan three days thereafter. (Ct. Docket No. 476, p. 11). Suffice it to say that none of these recitations make much sense, with the dates given, except in terms of a negotiated consent order.

On September 23, 1991, the day before the scheduled hearing, the debtor filed a one-page "Supplement" to its September 16, 1991 motion reciting that the debtor was unable to obtain financing for the environmental remediation work; requesting that the Court "allow the use of estate funds for the asbestos clean-up"; and stating that if the Court allowed the use of estate funds "the debtor will place a superpriority lien on his properties securing these funds for the benefit of the unsecured creditors." (Ct. Docket No. 469). This sketchy and procedurally inappropriate way of trying to prime secured creditors on the 44 Broad Street property to the tune of a half million dollars illustrates the haste with which the EPA matter was presented to the Court in September of 1991. No Court would prime secured creditors on

the basis of such a document and the short notice given.

At the remediation motion hearing on September 24, 1991, Attorney Ellis for the debtor quoted from the EPA Order about an "imminent and substantial endangerment" without any indication that there might be some issue about the factual and legal ramifications of that language. (Transcript, 9/24/91, p. 8). When the Court asked why the matter was presented with urgency for expenditure outside of a plan, Attorney Ellis responded "Why we need to do this now is because the EPA has put us on a short leash and we actually have started to commence the work right now. The EPA has ordered us to do that." (Transcript, 9/24/91, p. 11). When the Court questioned why an imminent danger existed then that did not exist a year before when the bankruptcy was filed, the attorney conceded that "the asbestos situation I don't believe has changed." And when the Court then asked why the matter could not be considered a few weeks or a month later when a plan was before the Court, the attorney responded that, "The problem with waiting two weeks or a month is that the EPA is probably going to come in and clean this up themselves if we don't do it" and mentioned as one factor the approaching winter season. (Transcript, 9/24/91, pp. 11–12).

At this point the Court and Attorney Ellis engaged in a further colloquy at the September 24, 1991 hearing which sheds considerable light on how and why the 44 Broad Street problem surfaced in the Court at the time it did:

\* \* \* \* \* \*

Mr. Ellis: The other issue is the issue of discharge.[7] If we could get away—if we were confident that Mr. Rancourt could get his discharge from the EPA claim, I think we would stop work right now, and

5. Apparently even *after* the September 3, 1991 "Second" EPA Order was entered there were various further revisions submitted by the debtor and approved by the EPA.

6. The EPA itself in subsequent pleadings indicated that the EPA 1991 Order was obtained with the consent of the debtor. See footnote 15 below, and related text.

7. Technically, counsel here is not referring to "discharge" as being a liability rendered nondis-

chargeable under § 523 of the Bankruptcy Code but rather a possible EPA contention post-bankruptcy that any unpaid remediation costs with regard to 44 Broad Street would survive as a liability owing by Mr. Rancourt since those costs would not constitute a "claim" regarding a "debt" subject to being discharged under the general provisions of § 524 of the Bankruptcy Code. (See Ct. Docket No. 476, pp. 14–16).

we would let the EPA clean it up; but if Mr. Rancourt comes out of this confirmation with an $800,000 or more obligation, there is a good chance he's going to be right back into this Bankruptcy Court.

The Court: Yes, but there is a settlement with [Mrs.] Rancourt going on, and to evaluate whether that is fair and equitable, the court I think should have all the cards on the table; and that's what we'll have in a plan of reorganization. You want to have one card played now—

Mr. Ellis: If we don't—

The Court:—and then take that existing situation, that plan, and say in the existing situation this is a fair and equitable situation.

Mr. Ellis: If we don't play that card, as we said, now, it's going to be a whole different card. We have negotiated heavily to get this price down from $800,000 to $400,000. We've negotiated to get this contractor to get going. The EPA certainly hasn't assured us that they're going to hold off, where they're entitled to administrative priority, treble damages, and a nondischargeable claim is going to make a significant statement on what's going to happen with this reorganization and it will be too late two months down the road. Not only that—

The Court: But this is paying off a liability of Mr. Rancourt of 400,000.

Mr. Ellis: No question. In exchange for paying off that liability and getting that discharge, he's also going to get a million dollars from Mrs. Rancourt, the family trust. If—

The Court: Well, maybe he should get a million and four.

Mr. Ellis: I can't speak for them, but we certainly have let the Creditors' Committee—

The Court: Well, I don't know either. The point, though, counsel, is that I don't know. So how can I determine that this is appropriate use of estate funds outside a plan of reorganization when you wait a year to bring it to me?

Mr. Ellis: The reason it—the reason we're here a year later is the—one of the reasons is the *LTV* case. We were hoping at some point we could maybe assert that this is a dischargeable claim, and we were playing—keeping that card in our back pocket. *LTV* has made us a lot less optimistic about bringing that—actually made us pessimistic, to be honest.

The other reason is we didn't know we would—needed an escrow agreement, and we were doing whatever we could to try to keep the EPA from going in and cleaning it up and asserting a claim. If—if this Court has an alternative that we think is not going to jeopardize the—or that you think is not going to jeopardize this reorganization, we'll be happy to hear it; but this discharge issue is something that is going to make—

The Court: Well, the point, counsel is that—quote, "this reorganization," unquote, is not a fait accompli.

Mr. Ellis: I understand that.

The Court: And to stack the cards in that way, to say that this has to be done to preserve, quote, "this reorganization," unquote, is stacking the cards.

Mr. Ellis: I am caught in the same concern. If we don't do this, your Honor,—I know we haven't got to confirmation yet, but if we don't do this, the million dollars is at jeopardy, this reorganization is at jeopardy, and—

The Court: And so is the settlement in jeopardy. How could you negotiate a settlement with Mr. Rancourt without factoring in the exact cost and how this thing is going to happen.

Mr. Ellis: It was factored in. The number was factored in at $300,000. It went up $100,000 in the last three weeks unexpectedly to the estate. We have been keeping the Creditors' Committee advised. They were on board with respect to the $300,000. I don't think I could say that they're on board with respect to the 400.

The Court: Well, we haven't even gotten to the fact that the secured creditors will be benefitted to $400,000 by this proposal.

Mr. Ellis: I—I talked to Ms. Scheer about—

The Court: As opposed to an outright abandonment. The Supreme Court in the *Midlantic* case held, and most courts have followed the footnote which was the decision. It has to be an imminent danger to public health. Imminent. And that, I think, is the question here. Is there an imminent danger to public health? If the EPA goes off on its own and does it and comes in here for $800,000 and it isn't shown that there is an imminent danger to public health and there's been an abandonment, I don't know that that claim can be allowed.

Mr. Ellis: Assume—let's assume—

The Court: those are issues that have to be addressed.

Mr. Ellis: Assuming you're right, let's assume that's all right, we're still going to have Mr. Rancourt with a nondischargeable claim, or he's going to be a debtor, not a debtor in possession owning this property in the claim of the EPA. Whether we can effect a reorganization is in doubt, and if this goes into liquidation as our plan and disclosure statement has shown, there is going to be zero distribution to creditors. We've made the analysis that looking at all of these factors it makes sense for this reorganization to clean it up, and it's going to benefit these creditors.

The Court: It's sure going to benefit the lienholders.

Mr. Ellis: Well, we don't have a problem with a priority lien—

The Court: Plus which in a plan you could provide for a litigation against other parties responsible.

Mr. Ellis: And we do that.

The Court: You know, everybody and his uncle is responsible for that if they had anything to do with the property.

Mr. Ellis: And Mr.—

The Court: The former owners, the current owners, the lienholders, the passers-by on the street that look at it.

Mr. Ellis: We have claims—

The Court: Read the Superfund statute.

Mr. Ellis: Absolutely. Mr. Nightingale has read it 70,000 times, I'm sure. We have claims against insurance carriers, po-

tential corporate owners, potential owners with Mr. Cabral who was an owner with Mr. Rancourt. We're certainly pursuing those and hope to recover some funds from those and as well as assign them to the unsecured creditors. There are some pitfalls with some of that litigation. Some are going to be more successful than others, and we've said in our disclosure statement we hope the $400,000 is zero, but that litigation has to proceed before we can really tell you slam dunk we're going to get those new funds, but we are certainly pursuing those, and we agree with you.

The Court: You haven't asked to prime the existing mortgage holders.

Mr. Ellis: We have filed a supplement—I know it was late yesterday—we certainly support that. We don't—we think we can do an under—

The Court: It didn't occur to you when you originally presented this?

Mr. Ellis: When we discussed it with the Creditors' Committee, they did not ask for it. I have no problem with—

The Court: They didn't ask for it. You wanted to hand $400,000 to the mortgage lienholders?

Mr. Ellis: Well, originally it was $300,000.

The Court: Free of cost?

Mr. Ellis: No, the idea—to walk you through the—

The Court: Is Mr. Rancourt on those personal liabilities?

Mr. Ellis: I think so . . .

\* \* \* \* \* \*

(Transcript, 9/24/91, pp. 12–18).

The Court at the September 24, 1991 hearing inquired of another attorney for the debtor as to the nature of the danger from the asbestos in question as follows:

\* \* \* \* \* \*

The Court: Do the reports indicate that the asbestiosis danger comes from asbestos in the river or from asbestos in the air? Or both? Is there some demonstrated danger to the public health from asbestos going into the river? And if so, what's the chain of causation?

Mr. Nightingale: The—I believe the concern of the Agency with the asbestos in the river is that it would wash downstream and eventually end up on the river banks, it would dry out, and then in windy conditions would become airborne. As far as ingestion in the river, I think there is very little prospect of asbestos being harmful in that condition. It's once it becomes airborne through natural forces where it becomes a concern.

\* \* \* \* \* \*

(Transcript, 9/24/91, pp. 22-23).

The interplay between the EPA matter and the settlement with regard to the transfers made by Rancourt pre-bankruptcy was also the subject of a colloquy between the Court and counsel for one of the major creditors during the September 24, 1991 hearing as follows:

\* \* \* \* \* \*

Ms. Scheer: As far as the million dollar—I mean, that's news to me that this million dollar settlement with the Rancourt family was somehow conditioned on Mr. Rancourt being discharged from this EPA claim. The representation to my client, at least my understanding of it, which could be erroneous, but has always been that that million dollars is being given in settlement of a lot of transfers from Mr. Rancourt to the children and family trust and to his wife.

We never factored in nor were apprised we should be factoring in a discharge from Mr. Rancourt on the EPA claim on the offer of a million dollar—

The Court: This is pure and simple another $400,000 to Mr. Rancourt. Now how you could sit around and negotiate a settlement without that factor being on the table is beyond me.

Ms. Scheer: It may have been with the Unsecured Creditors' Committee, and I wasn't involved in any of those discussions,

so I don't want to represent that, but it certainly hasn't been with my client, who is fairly central to this million dollar settlement.

The Court: Well, you know, this just illustrates the wisdom of having major transactions done in the context of a plan of reorganization with a full disclosure statement. That tells everybody what is going on, and this piecemealing approach is only tol—you know, can be tolerated by a Court if there is some imminent danger to the public health and safety. If there is, the Court has to deal with that. But barring that—and I start with the proposition that if we're here a year and now all of a sudden it's become an imminent danger, maybe it isn't so imminent. Maybe it—

Ms. Scheer: It's even more than a year, Your Honor. As Attorney Ford pointed out, the EPA has been issuing orders and making statements about that site since March 30th, 1987. So it's—it's interesting that at this juncture of this case, since 1987—

The Court: Well—

Ms. Scheer:—all of a sudden at this juncture in this case the EPA decides it's an imminent danger.

The Court: Well, that depends on the history of it. It may be the EPA was frustrated by various litigation or something that they did their best and they just couldn't get it ordered.[8]

\* \* \* \* \* \*

(Transcript, 9/24/91, pp. 26-28).

It is apparent from the entire transcript of the September 24, 1991 hearing that it was Mr. Nightingale and not Mr. Ellis that had handled the various negotiations and analysis regarding the 44 Broad Street EPA problem. Mr. Nightingale noted "I'm not a bankruptcy attorney. I'm an environmental attorney." (Transcript, 9/24/91, p. 41). He then indicated in his discussion of District Court deci-

---

8. The review of the entire history of this matter indicates to the Court that the EPA had simply discovered a person, i.e., the debtor Rancourt, willing to "spend other peoples' money" on the 44 Broad Street property problem and the EPA simply took advantage of the situation. It is not credible that the EPA would in fact have immedi-

ately moved in to correct the conditions at the site, before the entire question could have been heard as a part of a plan of reorganization within a month or so when they had taken no such action since first raising an issue about the property in 1985.

sions that he accepted their decisions as establishing that "When EPA has determined that a hazard is imminent, it is"; this statement by Attorney Nightingale demonstrates that he had no conception whatsoever as to a possible different result in the bankruptcy proceeding by virtue of the footnote in the *Midlantic* decision. Cf. *Midlantic National Bank v. N.J. Department of Environmental Protection,* 474 U.S. 494, 507 n. 9, 106 S.Ct. 755, 762 n. 9, 88 L.Ed.2d 859 (1986). The Court noted that distinction, *see* Transcript, 9/24/91 pp. 42–45, and noted that the Court had "very little briefing at this moment on anything" and clearly put the debtor's attorneys on notice that they ought to look at this matter from the *Midlantic* footnote aspect as well before the next hearing.

The Court concluded the September 24, 1991 hearing by scheduling a further hearing for September 27, 1991[9] and noted among other things the following:

> The Court: I cannot approve this today.... I am not going to begin to approve this unless some procedure is implemented to prime the existing mortgagees, or at least attempt to put them on notice and see if they have any controversy about it. I'm told on these pleadings the property has no equity value with the current environmental problem and that if this is cleaned up it will be worth something of this magnitude, what it cost to expend it or to clean it up, so those mortgagees are not on notice today that if this Court authorizes this expenditure the debtor would, in fact, step into the position of their liens and prime them for the benefit of the general unsecured creditors whose money is going to be used to pay for the clean-up. I mean, that's just elementary, but procedurally I don't think I'm in a position to do that today.
>
> Mr. Ellis: Your Honor, we did attempt to supplement the motion. Mr. Marco's of-

fice filed something yesterday, and I granted you whether Nashua Trust most importantly got that in time for this hearing I don't know. We attempted to do that. We—

> The Court: Well, they're not even here, I gather. I haven't heard from them.
>
> Mr. Ellis: No. We haven't either.
>
> The Court: So I can hardly prime the first mortgagee on this property with that kind of procedural situation. Plus which I think it should be opened to these people that need more time to talk to their clients to look at the situation and see whether they still want to oppose it or what alternatives they might suggest.
>
> \*  \*  \*  \*  \*  \*

(Transcript, 9/24/91, pp. 48–49).

At the outset of the continued hearing on September 27, 1991 it was indicated that all parties agreed that there was an imminent danger presented by the current condition of 44 Broad Street, (Transcript, 9/27/91, pp. 3–4, 30, 36–37, 43–44, 53), and the Court responded "All right, I will take [that] it's given for present purposes that there is an imminent danger to public health and safety". (Transcript, 9/27/91, p. 3) The Court noted again later in the hearing that the one fact that it had that was solid was that there was an imminent danger to public health and safety which nobody had controverted and that therefore the obligation to correct the problem was an administrative expense obligation of the estate that had to be fulfilled.[10] (Transcript, 9/27/91, p. 44). An attorney was present on behalf of the general creditors' committee throughout the foregoing hearing.

The attorneys for the creditors' committee did on September 26, 1991 file a "Response of General Committee of Unsecured Creditors" (Ct. Docket No. 477) to the debtor's application for authorization for the remedia-

---

9. The Court by Order entered September 24, 1991 (Ct. Docket No. 471) required the debtor to serve the secured creditors, et cetera, and set up the September 27 hearing. The Order provided that the Court would "then consider the matter further with the showing by the debtor or any other parties in interest as to the imminence of public safety and health hazard involved" with the subject property. (Ct. Docket No. 471, p. 2).

10. It was at this point that the debtor's counsel should have informed the Court that there might be an issue about imminent "endangerment" under the EPA statutory language being different than factual imminent danger under applicable bankruptcy case law.

tion work in which it was indicated that the Committee supported the application "to the extent the Court establishes the estate's right to surcharge pursuant to 11 U.S.C. § 506(c) but further indicates that should the Court decline to grant the surcharge against the existing secured creditors and authorize a superpriority lien the Court should deny the application 'and grant the EPA such a lien' with such lien to be conditioned on the EPA's 'establishment, as a matter of law, of its entitlement to an administrative expense claim, with such administrative expense claim, if any to be limited to the debtor's estimated clean-up expense.'" In the context of a hearing in which it had been stipulated that factually there was imminent danger to the public health and safety, and in which legally it was obvious that procedurally the Court could not then grant the surcharge or superpriority lien requested, and in which the record then indicated that were the EPA to do the work the cost would escalate to two to three times the cost should the debtor perform the work, the position announced on behalf of the general creditors' committee in this pleading was a pure "straddle" that was of no use to a Court facing the need to make a pressing decision about public health and safety. Counsel for the general creditors' committee simply did not effectively challenge the EPA's factual assertions regarding imminent danger to public health and safety.[11]

The Court at the end of the September 27, 1991 hearing, after indicating it would approve the motion to authorize the remediation contract, refused to then rule on the surcharge or priming lien with regard to existing lien holders and was met with a flurry of objections and comments by Mr. Ellis urging an immediate decision regarding the secured creditors absorbing the cost. The Court rebuffed the attempt by Mr. Ellis to have the Court immediately rule on surcharge or priming liens against Nashua Trust Company and the other lienholders in the following colloquy:

\* \* \* \* \* \*

The Court: Well, a contractor certainly doesn't care whether [the] Nashua [Bank] ends up ultimately paying it.

Mr. Ellis: No—

The Court: As long as he gets paid cash. And if I authorize that from this estate, that's all the contractor is going to want to know.

Mr. Ellis: If the—if this doesn't go forward, I'm—I don't know if the Creditors' Committee is still going to support us. And if they say that they're not going to support us and this thing could eventually—

The Court: Nobody's going to tell me now there's no imminent danger to the public health and safety.

Mr. Ellis: I—

The Court: I'm not asking you about it. I'm going to direct you at the end of this hearing to comply with that order. Now if you want the EPA to do it, that's your position. But you will comply with the regulatory order.

Mr. Ellis: And that's why we're here. We—

The Court: I don't see how you can—how can you get out of it?

Mr. Ellis: We certainly are going to do what you tell us and that's why we're here. We wanted you to come and tell us that. What I'm telling you is we're—if we don't get this lien, we're concerned that it may jeopardize our reorganization.

The Court: Well, I understand that.

---

11. The Committee attorneys, in a memorandum in defense of their own fee application, prompted by the U.S. Trustee's original objection to that fee application, notes that they did inquire of the debtor's attorneys beforehand as to the factual support for the imminent danger assertion by the EPA and were advised "unequivocally that numerous tests had been taken, that the results were substantially higher than permitted levels, and that the testing was 'irrefutable'." (Ct. Docket No. 1057, p. 4). No such tests were actually done. See *In re Rancourt*, 144 B.R. 601, 603 fn. 3. Since the monies to pay for the 44 Broad Street remedial work were to come out of the pockets of the general creditors represented by the Committee, it is the view of this Court that further independent inquiry should have been made by counsel for the Committee before accepting any general assertions made in this regard by the attorneys for the debtor. As noted above, the debtor Rancourt in effect was "spending other peoples' money."

Mr. Ellis: And that that's not in the best interest of these creditors.

The Court: But I don't know that it's fair for me to be put in a position to in effect approve your reorganization in this context. And that's, de facto, what it is. You can make all kind of distinctions and whatnot, but the fact that somebody says that, "I'm not going to pay back a million dollars unless this problem is resolved," is just a fact. I don't even know now whether maybe it's better to litigate against that party and get more money back.

Mr. Ellis: Well, the creditor—

The Court: I have no idea.

\* \* \* \* \* \*

The Court: When did you file your original motion? The 16th or thereabouts?

Mr. Ellis: What was the date? It's right on there. We filed it on the 16th.

The Court: And it was heard on the [24th].

Mr. Ellis: Yes.

The Court: And it hadn't been served upon the mortgagees.

Mr. Ellis: That's not true. It was served, but it was only served the day before the hearing.

The Court: Alright, the—effectively the mortgagees were brought in here the day before the hearing. They didn't appear at the hearing.

Mr. Ellis: No, they didn't.

The Court: And I set it down on short notice for today.

Mr. Ellis: We met on Tuesday—

The Court: Now there is—the Court does have some discretion in pressing matters to force people to react quickly, but the only thing that I can understand that you're prejudiced on in going to a further hearing on the shifting of the cost is that it might take a long time or something, and maybe the present settlement unravels. If it's done promptly, and if you prevail as you think you will, you're back at Square One on your settlement, right?

Mr. Ellis: I don't know that. I wish I could say that.

The Court: Well—

Mr. Ellis: I don't know.

The Court: Well, you're certainly back where you would be if I granted now.

Mr. Ellis: If you granted this now, I think we, our settlement would be in place and we could go forward. But what I'm concerned about—I am confident that we're going to win. I think our argument under 506(c) is the right argument, and I don't think there's a lot more legal basis out there. But I think the facts as you apply them to the decision says that they should get a lien. What I'm concerned with—if that's going to be this Court's decision— and we think it will be eventually—we would rather that you ordered that now and not jeopardize what we've worked so hard to achieve to this point.

\* \* \* \* \* \*

The Court: Well, we have a contract and we have a context in which, if that isn't authorized, the EPA is going to go about it and the cost is going to be double. That's what this record says. So I'm taking 439 or 34, whatever that number is, as the administrative exposure here. Now if they can do it—there's no—nobody's raised any factual question that's what the cost of compliance is.

Mr. Ellis: Your Honor, it's—the 434 is the LRS contract. In our disclosure statement, we put a number at 490, or 495. Under the EPA order there are some, what we sort of call subcontracts where LRS has to bring in some other people to oversee and approve their work. But the number that we have used for our disclosure statement is 495 and that's been approved by the EPA.

The Court: So if that is done, the EPA is satisfied with compliance with their administrative work.

Mr. Ellis: That's right.

\* \* \* \* \* \*

The Court: I would find now that there is an administrative obligation of this estate to comply with the EPA order, and that that obligation that can be complied with under the—by going forward with the contracts that are the subject of the motion to the tune of 495,000, that this is an appro-

priate administrative expense of this estate to comply with that order, and therefore the debtor is authorized and directed to proceed with it. And that the question of whether that cost can be shifted to the lienholders and the secured creditors is not necessary to my determination to authorize and direct compliance with the EPA order, but that that issue may be—this order is without prejudice to the debtor or any other party in interest—well, it has to be the debtor actually—the debtor moving in its capacity as a Trustee in bankruptcy or Trustee, having the powers of a Trustee to institute an appropriate adversary complaint under Rule 7001, which I'll either interpret or direct that they do it—I can do that anyway—joining all parties necessary for the decision with regard to any 506(c) surcharge over against secured creditors, and that the Court would try to expedite the hearing and trial on that matter and without pretrial in a period of approximately thirty days.

(Transcript, 9/27/91 at pp. 47–49, 51–53, 56–58) [12]

On October 24, 1991 the debtor filed a motion to extend deadline to file a second amended joint disclosure statement, noting that revisions would be necessary revolving primarily around the debtor's settlement with the general creditors' committee regarding certain prebankruptcy transfers to Mrs. Rancourt, etcetera, and noting that the Court had previously ordered the amended disclosure statement to be filed by October 25, 1991. (Ct. Docket No. 492). This motion recites [cited below] that in connection with the debtor's settlement with the general committee there was an understanding that a certain minimum amount of funds would be available upon confirmation for distribution to the general creditors. The statement continues:

Mainly as a result of increase and expenses of the estates, most significantly the rise in estimated remediation cost for asbestos contamination of the Debtor's 44 Broad Street property, there will be insufficient funds available to provide for such minimum distribution on the effective date of the Plan. The Debtor is consulting with the General Committee and hope to restructure the settlement and resolve this issue within the next 30 days. The Debtor is uncertain whether this can be accomplished.

(Ct. Docket No. 492, p. 2)

On November 19, 1991 the Court held a hearing on an Order To Show Cause as to whether to convert or appoint a chapter 11 trustee in view of the lack of progress in the debtors' plan efforts. The Court as a result of this hearing authorized the appointment of a chapter 11 trustee. The transcript of this hearing indicates that the debtors would not be pursuing their pending plan and no one objected to the appointment of chapter 11 trustee. Mr. Ellis at the November 19, 1991 hearing, on behalf of Mr. Rancourt, had a colloquy with the Court as to what had happened and what was pending with regard to the plan and the EPA as follows:

Mr. Ellis: Your Honor, we've worked very hard in the last fourteen months, never more so than in the last two weeks to try to put a settlement together. We feel like we've taken the case with Mr. Rancourt to the ten-yard line but we couldn't push it through to the end.

The Court: Through the toxic waste.

Mr. Ellis: Exactly. It became clear when the FDIC became the major creditor and unsecured creditor, as well as we reached an impasse with the Creditors' Committee that we would not be able to file a disclosure statement and Mr. Rancourt agreed to relinquish management. But I just wanted—Mr. Rancourt wanted to leave the Court with where we started and where we

---

12. It is obvious from this sequence that Mr. Ellis and the debtor were being driven on the EPA matter to get it paid off at a number that would permit the settlement to be accomplished with Mrs. Rancourt on no more than the million dollars already negotiated, i.e., the bottom line would be x% distribution to general creditors and this explains Mr. Ellis' repeated nervous attempts to get the Court to rule prematurely on the surcharge matter. The point to note is that the payoff with regard to the remediation work was improperly being mixed in with the negotiation of an appropriate amount to cover Mrs. Rancourt's liabilities with regard to fraudulent transfers that had nothing to do with the EPA matter.

began, because we have not left this estate in a bad state. When I first became involved about fourteen months ago, everybody was suing Mr. Rancourt. Since that time, he's made substantial progress and he wanted me to focus on a few things. He's implemented his business plan. He's gone from thirty-two properties down to essentially five. He's downsized his company substantially. He's accumulated over a million dollars in cash. That's after he's replenished security deposit escrows. 44 Broad Street—at least now we have quantification. We've negotiated a settlement with the EPA so we know what we need to get done and—

The Court: That work is being done?

Mr. Ellis: Yes. Pursuant to your order.

The Court: When is it supposed to be completed?

Mr. Ellis: Within the next thirty days?

Mr. Rancourt: Thirty to sixty.

Mr. Ellis: Thirty to sixty days. And we're doing that right now. And the last thing is, even though our plan did not—

The Court: Is the question of who ultimately will bear that still open?

Mr. Ellis: You—

The Court: Between the debtor and the mortgagee?

Mr. Ellis: You've ordered that that expense is an administrative expense of this estate. I am sure the Chapter 11 Trustee will review that again, but we've done a lot of research—

The Court: Well, but the—it's open to the Chapter 11 Trustee to seek a surcharge or whatever against the mortgagee if he or she believes—

Mr. Ellis: And—

The Court:—there's basis for it.

Mr. Ellis: We've drafted those pleadings and we'll be happy to just turn our research and draft pleadings over to the Chapter 11 Trustee.

The Court: I think you should so that he's aware of that.

Mr. Ellis: We're all—absolutely. We've already shared it with the Committee and be willing to do that with the Chapter 11

Trustee. And the last thing, even though our plan did not go to confirmation, certainly the negotiations have benefitted these estates. I understand that the plan that Mr. Walsh had filed has a lot of provisions that's very similar to Mr. Rancourt's plan. So hopefully, the Chapter 11 Trustee can pick up the ball at the ten-yard line and push it across the line and Mr. Rancourt just wanted to let the Court know that it will work in helping the transition.

The Court: Well, I'm aware that that toxic waste problem in the Nashua property threw a rather large clinker in the whole process; and as it often does in these reorganization cases, those are not book liabilities that stand out very strongly and parties sometimes don't deal with them early in the case. But you—the Chapter 11 Trustee should certainly be made aware of the reasons why I entered that emergency order and that I did not determine ultimately whether the mortgagee gets what might be called a windfall or whether the debtor is liable for it as an administrative expense that cannot be charged to the secured creditor for various reasons that were booted about during that hearing. I have not expressed an opinion one way or another and I don't intend to other than to direct the Chapter 11 Trustee to look into that, because that is a rather novel question of law and notwithstanding the Second Circuit's opinion, which I find indecipherable, we have no authority in the First Circuit. And I do not decide cases based on what headline writers in New York write about Second Circuit decisions. I've read that decision seven times and I challenge anybody to come out with a clear statement of the holding of that.

Mr. Ellis: That makes me feel a lot better.

The Court: The only reason I'm bold enough to say that is I'm six hundred miles from the Second Circuit building, but I think some commentators have said the same thing. They tried to draw a line that logically could not be drawn.

Mr. Ellis: Well, we agree that there is no reason to reinvent the wheel. We've done—Goodwin/Proctor's done a lot of re-

search on that and we'd be happy to pass it along to the Trustee.

The Court: All right, I'm going to direct the clerk to have this transcribed promptly so the Chapter 11 Trustee can have this hearing to review as he or she starts their work.

Mr. Ellis: Thank you, Your Honor.

(Transcript, 11/19/91, pp. 10–13)

Notwithstanding all the representations made by Mr. Ellis and Mr. Nightingale at the September 24 and 27, 1991 hearings, the Court was presented at a hearing on May 15, 1992 with a "Motion for Order Authorizing Chapter 11 Trustee to Expend Estate Funds for Environmental Remediation and to Enter into Contracts Incident Thereto" filed by the Chapter 11 Trustee on April 21, 1992 (Ct. Docket No. 583) requesting authorization to expend additional estate funds far in excess of the original $495,000 cap set forth in the September 1991 Order. The Court balked and directed that there be a full-scale evidentiary hearing on the actual danger if any to public health in view of a now-escalating request to authorize approximately $1,200,-000 in total clean-up expenses on a $500,000 property when there appeared to be an understanding and stipulation at the prior stage of the case quantifying the exposure at a relatively low amount. The evidentiary hearing was held on June 5, 1992 and resulted in a reported decision entered June 12, 1992, *In re Rancourt*, 144 B.R. 601, (Bankr.D.N.H. 1992) authorizing only another $10,000 of stone cover.[13]

In its June 12, 1992 decision the Court noted that pursuant to the representations of the parties at the September 1991 hearing it had accepted a stipulation in open Court that the site in question was an imminent and substantial endangerment to the public health but now recognized that stipulation inadequately addressed the issue in a bankruptcy context:

The Court has since discovered, as a result of the June 5, 1992 hearing, that the phrase "imminent and substantial endangerment to the public health or welfare or environment" is a term of art as it is written and used in the CERCLA statute. 42 U.S.C. § 9606(a). An endangerment finding by the EPA authorizes it to commence an abatement action. The point here is that the EPA's determination of endangerment may be premised on the possibility or threat of a risk to the public health and welfare which may materialize in the future from existing conditions although there is no present threat. *U.S. v. Conservation Chemical Co.*, 619 F.Supp. 162, 191–94 (N.D.W.D.Mo.1985); *B.F. Goodrich Co. v. Murtha*, 697 F.Supp. 89, 96–97 (D.Conn.1988), *aff'd, B.F. Goodrich v. Murtha*, 958 F.2d 1192 (2d Cir.1992). This counterintuitive specialized meaning differs from the traditional understanding of the phrase "imminent and substantial risk to the public health and welfare" as that phrase was analyzed by the Supreme Court in *Midlantic Bank v. New Jersey Dept. of Envt'l Protection*, 474 U.S. 494 n. 9, 106 S.Ct. 755 n. 9, 88 L.Ed.2d 859 (1985 [1986] ). ("This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.") (emphasis added). The EPA administrative record received into evidence in this case contains no such finding of actual present identifiable harm

---

13. The June 12, 1992 decision also authorized an additional $98,000 to be paid to the environmental contractor LRS Enviro–Services, Inc., as an equitable matter, inasmuch as the attorneys for the debtor had neglected to serve a copy of the September 1991 Order establishing the $495,000 cap upon LRS who proceeded to exceed that cap unknowingly. Counsel's lame excuse that the Clerk's direction that he serve "the parties" with the September 1991 Order, and that LRS was not itself a "party" to the chapter 11 proceedings, is deemed unacceptable for a professional charging the fees involved in this case. I found before and will restate that this record establishes that counsel for the debtor did not advise LRS, either orally or by serving a copy of the Order, that the Court had placed a maximum cap on their reimbursement without further order of the Court.

although it does make the CERCLA statutory finding.

Since the *Midlantic* decision, courts have reached opposite results in determining whether an imminent and substantial harm exists for purposes of denying a debtor or trustee's motion to abandon contaminated property pursuant to 11 U.S.C. § 554. Compare *In re Smith–Douglass*, 856 F.2d 12 (4th Cir.1988) (unconditional abandonment ordered where bankruptcy court found violation of state environmental laws but did not find any imminent and substantial risk to public) with *In re Stevens*, 68 B.R. 774 (D.Me.1987) (the court found that illegal and improper storage of hazardous substances constitutes an imminent and identifiable harm); [In re] *Peerless–Plating*, 70 B.R. 943 (Bankr.W.D.Mi. 1987) (Under *Midlantic*, trustee cannot abandon property in violation of CERCLA).

*In re Rancourt*, 144 B.R. 601, 603 at fn. 1 (Bankr.D.N.H.1992).

The Court in its June 12, 1992 decision, after hearing testimony from the EPA's national expert on airborne asbestos matters, also concluded that the EPA had failed to establish any imminent danger—relevant in the sense pertinent to the question of abandonment in a bankruptcy proceeding—with regard to the site in question:

\* \* \* \* \* \*

Based on the factual record developed at the June 5, 1992 hearing, I find that except for the exposed areas where there is asbestos soil contamination exposed due to the recent washouts there is no imminent danger to public health and safety in the site as it now exists. I apply the *present* factual standard appropriate for Bankruptcy Code purposes (see footnote 1 supra) and not the CERCLA standard appropriate for purposes of *initiating* administrative agency activity.

\* \* \* \* \* \*

With regard to the factual record on this specific area it is arguable that if there is a washout or something that exposes some of this soil that has asbestos, and if that is not covered quickly, then there could be some airborne asbestos fibers emanating from that soil. However, the only record basis I have for that finding is the "common sense" observation of one of the witnesses that when asbestos becomes dry or "friable" it can be picked up by the wind and/or by people walking across it and that to some extent it could get in the air. This record does not establish any quantitative measure as to how serious a danger that possibility might present to the public health and safety. Taking that aspect of the record together with the fact that any exposure should be very short-lived, in view of my order and direction to the trustee to monitor the situation and to immediately cover any such exposure, I find that there will not be any danger or imminent danger to public health and safety from any such washout, in terms of airborne pollution or airborne asbestos subject site encompassed by the specific further provisions of this order.

\* \* \* \* \* \*

Since the subject site came to the attention of environmental authorities in 1986, and throughout earlier activity by both the state and federal authorities, no scientific monitoring of air quality emanating from the site to detect and quantify any airborne asbestos danger from the site has been performed by any environmental agency including the EPA to date.

\* \* \* \* \* \*

*In re Rancourt*, 144 B.R. at 602, 603.

On June 23, 1992, the debtor's attorneys filed a "Motion to Delineate and Circumscribe Counsel's Scope of Duties to the Debtor" setting forth various conflicts between the interest of Mr. Rancourt and the interest of unsecured creditors and the bankruptcy estate. (Ct. Docket No. 644). The motion notes that LRS had conducted over $580,000 in work but had received only $445,000 to date. To complete the remediation work and pay LRS would cost at least $550,000 more according to the motion. (Ct. Docket No. 644, p. 4). The motion further states as follows:

The Trustee intends to ask the Court for authority to abandon the property to Ranc-

ourt. If the Property is abandoned, the estates will have no further obligations to expend funds to remediate the environmental contamination at the Site. That duty will fall to Rancourt. If the property is not abandoned, Rancourt's interest in a fresh start will be enhanced, but at the expense of the estate.

\* \* \* \* \* \*

To advocate Rancourt's position in this matter is to seek to saddle the estate with the $550,000 additional expense to remediate the environmental contamination. Such a result may well be the appropriate legal outcome. Nonetheless, for Debtor's Counsel to advocate that position before this Court is patently untenable for at least the following reasons:

(a) *Role of Debtor's Counsel as Fiduciary Estate.* Counsel has expended substantial time, services and expertise in rehabilitating these estates to allow the Trustee to retain over $1,500,000 in cash and over $100,000 a month in cash flow. The Property is substantially over-encumbered and even in a fully remediated state would have a value of less than half of the estimated remediation costs. For Counsel to support Rancourt in his opposition to abandonment conflicts with Counsel's duties to the estate and would, if successful, vitiate the effects of its past and ongoing services to establish a financial basis for these estates and to maximize the return to creditors. Abandonment of the Property will preserve the assets of these estates. Successful opposition to abandonment will not.

(b) *Estate Assets May Not be Used to Secure Personal Privilege for Debtor.* Debtor's Counsel's primary duty as an appointed officer of this Court is to maximize the value of and otherwise benefit the within estates. Counsel has fulfilled that role vigorously throughout this case. However, the efforts of Debtor's Counsel in a matter of personal privilege to Rancourt would not be compensable from estate funds. Counsel is as unwilling to risk nonpayment for its efforts in this regard as it is to risk disqualification by accepting

third-party funds to argue a position in favor of diminishing this estate's assets. Services rendered primarily to preserve the benefits to Rancourt of any discharge he may obtain in this case must be seen as being for the purpose of exercising a personal privilege of Rancourt, rather than performing legal duties of the estate. *See Matter of Jones,* 665 F.2d 60 (5th Cir. 1982); *In re Weingarden,* 84 B.R. 691 (Bankr.S.D.Cal.1988); *In re Ryan,* 82 B.R. 929 (N.D.Ill.1987); *In re Cleveland,* 80 B.R. 204 (Bankr.S.D.Cal.1987); *In re Duque,* 48 B.R. 965, 975 (S.D.Fla.1984). It would be particularly unfair to Counsel to require it to perform noncompensable services in a case where it holds an unpaid $750,000 administrative expense claim.

\* \* \* \* \* \*

If acceded to, Rancourt's request that Debtor's Counsel oppose the proposed abandonment would place Counsel in the unenviable position of advocating a position not only adverse to the estate in whose employ it serves, but adverse the financial interests of that very same Counsel. As the estate's largest administrative expense creditor, Counsel would be forced to argue a position fundamentally at odds with its own expectation of compensation out of the funds of this estate. Disciplinary Rule of Professional Conduct for Lawyers 5–101(A) explicitly provides that a lawyer should not accept employment that would affect his own financial interests. No starker example of the application of this rule can be imagined than the present case: Counsel's success in promoting Rancourt's personal discharge privilege would cost the estate some $550,000 and directly imperil Counsel's own prospects of payment for all the services it has rendered to the reorganizing of Debtor's entities.

\* \* \* \* \* \*

(Ct. Docket No. 644, pp. 5–8).

The motion of the debtor's attorneys was granted by an Order entered by the Court on July 16, 1992. (Ct. Docket No. 662).[14]

---

**14.** It is obvious that the conflicts listed in the

referenced motion and order were existing and

A motion to approve a settlement between the chapter 11 trustee and EPA (Ct. Docket No. 31, AP 92–1095) filed on September 30, 1992 in an adversary proceeding that resulted from the Court's June 1992 decision reserved rights by both the trustee and the EPA as to proceedings against third parties, but was a mutual release of any claims back and forth between themselves other than a payment of $75,000 to the EPA by the trustee out of the debtor's estates, in full and complete satisfaction of all EPA claims. The EPA agreed not only to waive and release all of its claims against the estate but also "to undertake any and all further actions which may be necessary or appropriate to complete the environmental remediation of the 44 Broad Street property. At his sole election, the trustee may abandon the Broad Street property or continue to own and operate it, without any further liability for environmental remediation." (Ct. Docket No. 31, AP 92–1095, pp. 7–8).

The memorandum of the EPA in support of the settlement agreement (Ct. Docket No. 37) states that "In many cases, an administrative order is issued only after negotiations with the responsible party on both the language of the order and the scope of the response actions to be taken at the site. In this case, EPA and Rancourt negotiated the response actions to be taken at the site under the second administrative order." [15] (Ct. Docket No. 37, AP 92–1095, p. 3) The EPA memorandum further notes that the settlement agreement releases the trustee of all responsibilities to conduct further activities under the Second EPA Order "saving the estates at least $352,000." (Ct. Docket No. 37, AP 92–1095, p. 11). The EPA itself estimated the work remaining to be completed under the Order as possibly costing up to

$600,000 if the government had to perform the work. (Ct. Docket No. 37, AP 92–1095, p. 12). The EPA memorandum also notes that under the proposed settlement all response actions at the site will be completed without additional funds from the debtor's estates and therefore "both the debtor's estates and the secured creditors will receive the value of a remediated piece of property without any additional expenditures for response actions or litigation expenses." An Order was entered in October 1992 (Ct. Docket No. 44, AP 92–1095) approving the settlement agreement with the EPA. The creditors' trust representative under the chapter 11 trustee's confirmed liquidating plan ultimately has been able to market the 44 Broad Street property for a net amount of $150,000 on the sale which closed in December of 1996.[16]

## CONCLUSION

■ The Court concludes, with regard to a final fee award for the attorneys appointed to represent the general creditors' committee, that those attorneys should be limited to the $120,000 already paid as interim compensation and that no further fees should be allowed for their services in that context.[17] If these attorneys had not elected to "straddle" with regard to the September 1991 hearings, the EPA and the debtor would have been required to come forward with factual showings to justify the expenditure, and presumably the legal issue involving the differences between "imminent danger" and "imminent endangerment" would have surfaced earlier in the proceedings and could have resulted in substantially reduced expenditures with regard to the 44 Broad Street property. Since these attorneys were representing the gener-

should have been apparent to counsel at least by July of 1991 rather than July of 1992.

15. This reaffirms that it truly was a consent order agreed to by the debtor and the debtor's attorneys even though it was presented to the Court at the first hearing in September of 1991 as an emergency in which the debtors were "ordered" by EPA to do various things suggesting they had no alternative or other recourse.

16. The Court in ADV 92–1095 entered a final order declaring and determining rights with re-

gard to 44 Broad Street on November 30, 1992 (Ct. Docket No. 53) that determined the rights with regard to all of the defendants including those that had previously defaulted, et cetera.

17. These attorneys subsequently were appointed and did act as attorneys for the chapter 11 trustee and the Court has found their services in that regard efficient and effective and accordingly has allowed that application in full as requested. See separate Order entered this date, a copy of which is annexed hereto.

al creditors at that time, it is my view that they could have and should have inquired further both factually and legally as to the issue before they in effect allowed EPA remediation expenses to go forward without exploring and bringing before the Court the question of possible abandonment of the 44 Broad Street property. For those reasons, primarily involving ineffective representation of the general creditors on that matter, the compensation for the attorneys representing the general creditors' committee should be reduced and the amount of $120,000 is determined to be reasonable compensation for the services actually provided.

The final fee award requested by the attorneys for the debtors-in-possession and the individual debtor Rancourt raises more complex and subtle issues, because an attorney representing an individual filing a chapter 11 petition, who is subsequently appointed to represent the debtor-in-possession in that proceeding, always faces the prospect of some conflict between the ultimate interests of the individual debtor and those of the bankruptcy estate created by the reorganization proceeding. Not all divergence of interests in this regard *ipso facto* means that the individual debtor's attorney cannot also serve as an attorney for the debtor-in-possession. It is natural that an individual as debtor will seek to negotiate a plan that provides for as much value down to his equity position as is possible—preferably on a consensual basis with the creditors who have claims superior to his equity position. This does not represent a "conflict" that would present a problem for the attorney representing the debtor *qua* "debtor-in-possession" *provided that* full disclosure is made as to any divergence of interests in that regard that may be appropriate for the creditors and the Court itself to consider in context.

Fortunately, the Court of Appeals for the First Circuit has provided some explicit guidance to the court and attorneys in this area of the law. In *Rome v. Braunstein*, 19 F.3d 54 (1st Cir.1994), in a decision affirming the disallowance of fees to counsel for a chapter 11 debtor due to conflicts of interests, the Court of Appeals commented:

\*     \*     \*     \*     \*     \*

The Bankruptcy Code imposes particularly rigorous conflict-of-interest restraints upon the employment of professional persons in a bankruptcy case. Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

\*     \*     \*     \*     \*     \*

Moreover, as the bankruptcy court is invested with ample power to deter inappropriate influences upon the undivided loyalty of court-appointed professionals throughout their tenure, the need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment. The court "may deny allowance of compensation ... if, at any time during such ... employment ..., such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate...." Bankruptcy Code § 328(c), 11 U.S.C. § 328(c) (emphasis added). Thus, section 328(c) authorizes a "penalty" for failing to avoid a disqualifying conflict of interest. See S.Rep. No. 989, 95th Cong., 2d Sess. 39 (1978) U.S.Code Cong. & Admin. News 1978, pp. 5787, 5825.

\*     \*     \*     \*     \*     \*

These statutory requirements—disinterestedness and no interest adverse to the estate—serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.

\*     \*     \*     \*     \*     \*

Of course, disclosure of facts suggesting a conflict is not invariably followed by disqualification. In special circumstances, for example, the bankruptcy court could determine, in the sound exercise of its discretion, that any potential impairment of its

institutional integrity, or risk of divided loyalty by counsel, was substantially outweighed by the benefits to be derived from counsel's continued representation of multiple entities or the impracticability of disentangling multiple interests "without unreasonable delay and expense." *In re Hoffman,* 53 B.R. 564, 566 (Bankr. W.D.Ark.1985). See *In re O'Connor,* 52 B.R. [892] at 895 [ (Bkrtcy.Okl.1985) ] (noting countervailing interest in "curtailment of administrative expenses" where potential for conflict is dormant or remote). In no event, however, may counsel presume dispensation from the full disclosure required by § 327(a) or the sanctions authorized under § 328(c). See also Fed. R.Bankr.P. 2014(a).

Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed.R.Bankr.P. 2014(a), court-appointed counsel proceed at their own risk.

\* \* \* \* \* \*

[S]ince section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of interest normally should be resolved in favor of disqualification. *Cf. In re Freedom Solar Ctr. Inc.,* 776 F.2d 14, 17 (1st Cir.1985).

\* \* \* \* \* \*

*Rome v. Braunstein,* 19 F.3d 54, at 57, 58, 59, 60.

In an earlier case before the First Circuit Court of Appeals, *In re Martin,* 817 F.2d 175 (1st Cir.1987), where the attorney for a chapter 11 debtor-in-possession had prepetition taken a security interest in the debtor's assets to cover his fees for services before and after the chapter 11 filing, the Appeals Court determined that it would not impose any bright-line rule disqualifying such an attorney and would not rule that the payment arrangement with the attorney was impermissible *per se,* but the Appeals Court remanded the case for further findings consistent with its ruling. The Court in construing § 327(a) of the Bankruptcy Code stated:

\* \* \* \* \* \*

When construed in this fashion, the twin requirements of disinterestedness and lack of adversity telescope into what amounts to a single hallmark. Phrasing the standard in terms of the case at bar, the bankruptcy court was bound to inquire whether the acceptance of the Mortgage by V & D created either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable rise—or the reasonable perception of one. The test is not dependent upon the presence of connivance or overreaching.

\* \* \* \* \* \*

What counts is that the matter not be left either to hindsight or the unfettered desires of the debtor and his attorney, but that the bankruptcy judge be given an immediate opportunity to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding to the request. If a lawyer is desirous of benefiting from such an arrangement, he has a responsibility to leave no reasonable stone unturned in bringing the matter to a head at the earliest practical moment.

\* \* \* \* \* \*

The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails. If he perceives a materially adverse interest, he has at his disposal an armamentarium of permissible remedies, including (but by no means limited to) disqualification, disallowance of all or some fees, and invalidation of the security interest.

\* \* \* \* \* \*

*In re Martin,* 817 F.2d at 180, 182, 183.

The unique status and responsibilities of an attorney who continues to represent both an individual chapter 11 debtor and the debtor as debtor-in-possession was noted in *In re Bonneville Pacific Corp.,* 196 B.R. 868 (Bankr.D.Utah 1996) as follows:

Because of the unique nature of a bankruptcy estate and the concept that the debtor-in-possession is a fiduciary for that estate, courts have imposed a fiduciary duty upon counsel for a debtor. *In re Wilde Horse Enterprises*, 136 B.R. 830, 840 (Bankr.C.D.Cal.1991). When representing the debtor-in-possession, its attorney has a duty to look to the interests of the estate and not to the interests of its principals, shareholders, officers or directors. This purpose can only be realized when all who labor within the confines of the Bankruptcy Code would never countenance fraudulent behavior and greedy gain, all attempts to delay and deny, all motives dictated by hidden agenda.

Under 11 U.S.C. § 541 of the Bankruptcy Code, each estate is a separate and distinct entity. In these Chapter 11 cases, the debtors in possession act as "trustees" of the estates in bankruptcy and accordingly they may hire professionals, with court approval, pursuant to § 327. *See* 11 U.S.C. § 1107. Thus, a debtor in possession is a statutory fiduciary of its own estate. 11 U.S.C.A. §§ 1106, 1107(a). A trustee representing an estate in bankruptcy must receive independent counsel, regardless of the estate's relationship to other entities prior to filing. *In re Amdura Corp.*, 121 B.R. 862, 868–69 (Bankr. D.Colo.1990). The inability to fulfill the role of independent professional on behalf of the fiduciary of the estate constitutes an impermissible conflict. See *In re Adam Furniture Indus., Inc.*, 158 B.R. 291, 302 (Bankr.S.D.Ga.1993); *In re Prudent Holding Corp.*, 153 B.R. 629, 631 (Bankr. E.D.N.Y.1993) (§ 327(a) is prophylactic "to insure that the undivided loyalty and exclusive allegiance required of a fiduciary to an estate in bankruptcy is not compromised"). [*In re*] Interwest [*Business Equipment*], 23 F.3d [311] at 316 n. 9 [ (10th Cir.1994) ]. Accord; *In re Sky Valley, Inc.*, 135 B.R. 925, 939 (Bankr.N.D.Ga. 1992) (Because counsel for debtor in possession has fiduciary duty, counsel may be placed in the "unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client.").

\* \* \* \* \* \*

*In re Bonneville Pacific Corp.*, 196 B.R. at 885–886. The conflict and adverse interest in the *Bonneville Pacific*, case was that the debtor-in-possession's attorneys did not make any reference in the disclosure statement to possible avoidance actions against corporate insiders that ultimately resulted in an excess of $6,000,000 in recoveries by the succeeding chapter 7 trustee.

The real vice in these situations involving attorneys for a debtor-in-possession taking actions which benefit the individual debtor but arguably damage the bankruptcy estate, without full disclosure of all the factors involved and preferably incorporating the same within a plan of reorganization, is that "we will never know" what might have resulted had the bankruptcy estates' interests been preferred over the interests of the individual debtor. In a recent decision by Judge Vaughn of this Court in *In re Durbin*, 205 B.R. 17, (Bankr.D.N.H.1997), a 40 percent reduction in fees claimed was ordered as a sanction for an undisclosed conflict of interest by an attorney appointed as special counsel to a bankruptcy trustee, who had negotiated a settlement of the lawsuit for which he was employed but failed to disclose a conflicting interest he had for another client. The Court noted that the problem was aptly stated in the objecting U.S. Trustee's Memorandum: "The problem is that it will never be known whether the $35,000 settlement recommended by Attorney Feinman may have been for less than its true value. The fact that Attorney Feinman attached the [other] property even before the compromise was approved does nothing to dispel that discomfort." *In re Durbin*, at 19–20.

The First Circuit Court of Appeals in *Rome v. Braunstein*, 19 F.3d 54 touched on the same point as follows:

\* \* \* \* \* \*

[W]here court-appointed counsel has served under an undisclosed disqualifying conflict of interest, the bankruptcy court cannot always assess with precision the effect the conflict may have had either on the results achieved or the results that might have been achieved by following "the road not taken." See *Woods*, [*v. City*

*Nat. Bank and Trust Co. of Chicago*], 312 U.S. [262] at 269 [61 S.Ct. 493, 497–98, 85 L.Ed. 820, (1941) ] ("[T]he incidence of a particular conflict of interest can seldom be measured with any degree of certainty and [t]he bankruptcy court need not speculate as to [ ] the result of the conflict...."); *In re Tidewater,* [*Memorial Hospital*], 110 B.R. [221] at 229 [Bkrtcy. E.D.Va.1989] (denying compensation even though there was "[n]o doubt the law firm performed valuable services in the chapter 11 case").

* * * * * *

*Rome v. Braunstein,* 19 F.3d at 62–63.

[redacted] In the present case "we will never know" whether perhaps placing some $50,000 or so of gravel over the site in question, instead of the elaborate berm installed along the river edge and associated drainage facilities negotiated by these attorneys, would have put the property in such condition as to remove even any arguable bar to abandonment of the property in terms of immediate actual danger to the public health and safety.[18] The problem for the debtors' attorneys in supporting full allowance of their requested fees is not that they were necessarily wrong in concluding that an effort at abandonment would not be successful but rather that they "took it upon themselves" to resolve that arguable issue in favor of the interest of the individual debtor and at the expense of the bankruptcy estate without any disclosure in their plan or in their motion to authorize the environmental remediation expense of that alternative possibility.[19]

Attorneys choosing to continue to represent an individual debtor, or the principals and insiders of a corporate debtor, while also undertaking to be appointed to serve as the attorneys for the debtor-in-possession under the provisions of chapter 11 of the Bankruptcy Code, including particularly the provisions of § 1107 of the Bankruptcy Code, need to understand and be sensitive to the potential conflicts and divergence of interests in that situation that may develop during the course of the chapter 11 proceedings, and that may require disclosure that they "represent an

18. The Court recognizes that in 1991 the case law was such that it was not foreordained that such an abandonment effort would succeed. However, the point for present purposes is that such an alternative was not seriously explored, analyzed or even disclosed and presented to the Court and creditors for evaluation before these attorneys negotiated a consent order with the EPA that led to extensive expenditures on the site notwithstanding then-existing case law that would have indicated that abandonment should be considered as a serious alternative to be explored. *See, e.g., In re Purco, Inc.,* 76 B.R. 523, 533 (Bankr.W.D.Pa.1987) (abandonment can be allowed on "conditions that will adequately protect "public health and safety"); *In re Smith–Douglass, Inc.,* 856 F.2d 12, 15 (4th Cir.1988) (under *Midlantic* absent "showing of imminent harm" abandonment authorized despite presence of violation of state environmental law); *In re Franklin Signal Corp.,* 65 B.R. 268, 273 (Bankr. D.Minn.1986) (trustee has duty to take "minimal steps" to protect public until abandonment is authorized); *In re FCX, Inc.,* 96 B.R. 49, 54–55 (Bankr.E.D.N.C.1989) (abandonment not authorized when there is an "immediate" threat to public health and bankruptcy court will make that determination not EPA); *In re Anthony Ferrante & Sons, Inc.,* 119 B.R. 45, 50 (D.N.J.1990) (eight years of inaction by environmental agency after discovering contamination relevant to threat of "imminent and identifiable harm" to public health contemplated by *Midlantic* decision). *See also In re Shore Company, Inc.,* 134 B.R. 572, 579 (Bankr.E.D.Tex.1991) (".... this Court is unwilling to give great deference to the conclusory opinions of the EPA which are not premised on hard fact...."), which although rendered on October 23, 1991 (three weeks after the September 1991 hearings in this Court) gives a survey of the then-existing law both pro and con regarding the use of abandonment power in bankruptcy cases involving environmental disputes. The EPA itself recognized in this case that there exists "complex legal issues addressing the intersection of the Bankruptcy Code and CERCLA" in a Memorandum filed after the 1992 hearings. (Ct. Docket No. 37, AP 92–1095, p. 10). *Cf. In re Chateaugay Corp.,* 944 F.2d 997, 1002 (2nd Cir.1991).

19. It can fairly be said that perhaps the Court itself should have required a more extensive exploration of the abandonment option at the September 1991 hearings before authorizing the expenditures requested. However, at the time of those hearings the matter was presented as an urgent situation in which the "EPA ordered us" to perform the work immediately and in which the parties in interest stipulated to the imminent danger to public health and safety from the condition of the site. Also, no one then had focused on the legal issue relating to the "endangerment" language of the EPA Order. Perhaps judges deserve some protection from "hindsight review" as do attorneys.

interest adverse to the estate" and seek authorization to continue their representation or representations as may be appropriate after notice and evaluation of the conflict and its relative importance in the proceedings. 11 U.S.C. §§ 327(a) and 328(c). The fact that the attorney may be qualified to act for the debtor-in-possession as a "disinterested person" at the outset of the proceedings does not mean that the *separate requirement* under these statutes of not representing a client having an "interest adverse to the estate" may not be implicated and require disclosure as matters develop during the course of the reorganization proceeding. See *Rome v. Braunstein, supra,* 19 F.3d at 57–58. In the present case, the attorneys for the debtor had to know that their negotiations in 1991 with the EPA regarding expenditures on the 44 Broad Street property were in effect committing the bankruptcy estate, represented by themselves as attorneys for the debtor-in-possession, to obligations which might be performed at substantially lower expenditures if abandonment of the property could be authorized. Instead of submitting a motion for "delineation of duties" in this context then, as they did subsequently in 1992, the attorneys for the debtors submitted the July and September 1991 plans of reorganization and disclosure statements which made no mention of the alternative possibility of seeking abandonment of the 44 Broad Street property.

While the Court recognizes that these attorneys provided extensive and valuable services otherwise, in terms of legal issues arising from the operation of the debtor's properties prior to the appointment of the chapter 11 trustee[20], and that these attorneys negotiated and resolved numerous questions regarding lien claims and status of the titles to the various properties which were subsequently of benefit to the chapter 11 trustee in liquidating the properties, the fact remains that their services with regard to the 44 Broad Street property led to the collapse of the effort to achieve a plan of reorganization on a going-concern basis that might have resulted in greater distribution to creditors from the continuing management rather than the liquidation of those properties. Again, "we will never know" whether that better result would have been obtained, but we do know that the effort failed by virtue of the conflicted duties these attorneys attempted to pursue with regard to the resolution of the EPA dispute concerning the 44 Broad Street property.

The foregoing findings and conclusions support in my judgment a basis for a 50 percent reduction in the fees claimed by these attorneys as a sanction for failing to disclose and bring to the attention of the Court and the creditors, in an explicit manner much earlier in the chapter 11 proceedings, the diverging interests of the individual debtor and the debtor-in-possession *vis-a-vis* the EPA regarding the 44 Broad Street property before the Court and creditors were in effect "locked in" to an EPA Order demanding expenditure of significant sums by the debtor-in-possession with regard to that property. A blanket reduction in fees to determine reasonable compensation is allowable in such circumstances where precise measurements are not possible. See, e.g., *Rome v. Braunstein,* 19 F.3d at 63; *In re Durbin, at 19–20* (Bankr.D.N.H.1997); *In re York Village Associates,* 29 BCD 1283, 1287 (Bankr.D.Md.1996) (twenty-two percent blanket reduction); *In re Arnold,* 176 B.R. 13, 16 (Bankr.E.D.Tex.1995), (fifty percent blanket reduction). While it is recognized that this result is harsh to the attorneys, it is appropriate in the circumstances since they had it within their own power to avoid the problem by early and effective disclosure. See *In re National Liquidators, Inc.,* 171 B.R. 819, 827 (Bankr.S.D.Ohio 1994) *aff'd in part and rev'd in part,* by 182 B.R. 186 (S.D.Ohio 1995) (denying fees in full would have been avoided "had there been timely, complete, and accurate disclosure").

■ It is also important that a Court setting fees maintain "a sense of overall proportion" in determining reasonable fee compensation. *Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983). This is especially true with regard to compensation to a debtor's attorney whose services that personally benefit only the debtor are not compensable.

---

**20.** See *In re Rancourt,* 123 B.R. 143 (Bankr. D.N.H.1991).

As noted in *In re Spanjer Brothers, Inc.*, 203 B.R. 85 (Bankr.N.D.Ill.1996):

\*  \*  \*  \*  \*  \*

[F]ees for a debtor's attorney are properly payable out of estate assets when a commensurate benefit to the estate is provided, but not for services which personally benefit only a Chapter 7 or 11 debtor. See *In re Ryan,* 82 B.R. 929, 931–32 (N.D.Ill. 1987); see also 11 U.S.C. § 330(a)(4)(B). The 1994 amendment of the Bankruptcy Code to account for professionals' performance of administrative functions which might have no direct quantifiable benefit (see 11 U.S.C. §§ 330(a)(3)(C) and 330(a)(4)(A)(ii)(II)) did not alter the principle that compensable services must have been rendered for the estate's benefit. Unfortunately, the amended statute neither defines nor objectively sets the parameters of what is a compensable benefit to a debtor's estate.

Judge Barliant in *In re Lifschultz Fast Freight, Inc.,* 140 B.R. 482, 488 (Bankr. N.D.Ill.1992) aptly noted that the concept of "benefit to the estate" is not necessarily limited to an economic approach along the line that a dollar's worth of services must directly benefit the estate and bring a cash dollar into the estate in order to justify allowance of such dollar in cash compensation. The Court concurs with this view, in part, because the bankruptcy estate does not exist merely for esoteric purposes, but rather, serves as a fund from which allowed claims are to be paid in the order and priority established under the Bankruptcy Code. Thus, other factors besides the economic impact on the estate of actions taken should be considered in the "benefit to the estate" analysis.

One such nonexclusive factor to consider is whether the services rendered promoted the bankruptcy process or administration of the estate in accordance with the practice and procedures provided under the Bankruptcy Code and Rules for the order-

ly and prompt disposition of bankruptcy cases and related adversary proceedings.

\*  \*  \*  \*  \*  \*

*In re Spanjer Brothers, Inc.,* 203 B.R. at 90.

■ The Court, in *In re Arnold,* 176 B.R. 13, 16 (Bankr.E.D.Tex.1995), reduced claimed fees by the attorneys for a chapter 7 trustee by 50 percent for failure of the attorneys to keep a sense of proportion between the amount of fees and the amount of the estate produced. In the present case allowance of fees in excess of $919,000 (actually a total in excess of $1,129,000 when debtor-in-possession's special and local counsel compensation is included) to the general attorneys for the debtors and debtor-in-possession for essentially 18 months of services is simply out of proportion to the results produced and the size of the estate which ultimately required a liquidation of assets by a chapter 11 trustee. Substantial reduction in allowance of reasonable compensation to these attorneys would have been required even apart from their handling of the problems relating to the EPA and the 44 Broad Street property.

■ The objections by the United States Trustee and the FDIC also charged overstaffing by debtor's counsel with regard to the legal services provided in these proceedings. The Court agrees generally that the time records indicate excessive staffing and an inordinate number of conferences by numerous associates in the firm.[21] It is not necessary that a court setting reasonable fees focus on each and every time entry if the pattern of excessive hours and staffing appears knowledgeable to the court from its own experience. *U.S. Equal Employment Opportunity Commission v. AIC Sec. Investigations,* 55 F.3d 1276 (7th Cir.1995), *on remand,* 1995 WL 642775 (N.D.Ill. Oct. 30, 1995); *In re Arnold, supra,* 176 B.R. at 16; *In re Felix de Weldon,* 176 B.R. 665, 667, 668 (Bankr.D.R.I.1995); *In re WHET, Inc.,* 61 B.R. 709, 713 (Bankr.D.Mass.1986); *In re*

---

**21.** The debtors were represented in court hearings in these proceedings almost exclusively by associates of the law firm aside from appearances by local New Hampshire counsel. It is not clear to the Court that partners of the firm effectively supervised the activities of the associates to keep staffing and expense to a minimum for the services provided.

*Wildman,* 72 B.R. 700, 712 (Bankr.N.D.Ill. 1987). Reviewing the context and justification for each time entry in the voluminous records submitted by these attorneys, and requiring testimony and evidence as to the necessity for the expenditure of that time and the staffing of that matter, could easily consume another year in hearings and rulings in that regard. The setting of fees is not supposed to create another lawsuit. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (The fee application "should not result in a second major litigation"). In the present case, however, the Court need only determine, as it hereby does, that any reduction attributable to overstaffing and duplication of services by these attorneys is subsumed within the overall blanket reduction in fee compensation allowable to these attorneys by the Court.

The final fee allowances determined in this opinion for the attorneys to the general creditors' committee and the attorneys for the debtor and the debtor-in-possession shall be incorporated in the separate Order entered this date acting upon all pending final fee and expense requests in this case.[22]

## ANNEX
### ORDER ON FINAL FEE AWARDS

These jointly administered chapter 11 cases came before the Court on a duly-noticed hearing on final fee award requests including expense reimbursement requests by a number of professionals involved in the case. Due to the number and magnitude of the fee and reimbursement requests, and a number of objections thereto filed by the United States Trustee and other parties in interest, the Court has been required to undertake a review of the entire history of these cases and the Court files pertaining thereto before coming to a determination of final fee awards and expense reimbursements which would be reasonable in amount and necessary and proper in accordance with the requirements of § 330 of the Bankruptcy Code. That detailed review having been completed the Court now issues its order on the pending applications for compensation.

The requests for *final fee awards* in these proceedings (including reference to prior interim allowances paid during the course of the proceedings "on account" to alleviate hardship from delay in closing these proceedings) can be summarized as follows:

| Professional | Requested Award | Prior Payment | Balance |
| --- | --- | --- | --- |
| Choate, Hall & Stewart (Atty's for general creditors' committee) | $145,792.75 | $120,000.00 | $25,792.75 |
| Choate, Hall & Stewart (Atty's for trustee) | $445,807.75 | $205,000.00 | $240,807.75 |
| Stephen B. Darr (Ch. 11 Trustee) | $527,728.68 | $295,000.00 | $232,728.68 |
| Goodwin, Procter & Hoar (Atty's for DIP/debtors) | $919,682.00 | $442,600.00 | $477,082.00 |

22. As noted at the outset of this Opinion, the U.S. Trustee requested in her objection to the Goodwin, Proctor & Hoar fee application that further fees not only not be allowed but that the creditors' trustee appointed under the liquidating plan should be instructed to pursue possible recovery and disgorgement of fees previously paid to these attorneys. To the extent that that request is procedurally before the Court in an appropriate manner, which is debatable, it nevertheless is denied by this Court to save further time and expense to all concerned and to avoid further delay in distribution to creditors of these estates.

The attorneys were not acting directly contrary to established law but rather were acting in a context in which there was some existing case law that would indicate that authorization for abandonment would be difficult to obtain. See footnote 18 above. The sanction imposed by the 50 percent reduction in their final fee award is sufficient. Moreover, the plan of liquidation in this case was confirmed over a year ago at which time no party in interest sought to have that possible cause of action preserved for liquidation by the creditors' trustee under the plan.

| Professional | Requested Award | Prior Payment | Balance |
|---|---|---|---|
| Special DIP Professionals | $209,712.20 [1] | $209,712.20 | $0 |
| Hunter & Walsh (Atty's for special committee) | $ 96,201.00 [2] | $ 96,201.00 | $0 |

The requests for *reimbursement of expenses* in these proceedings (including reference to prior interim allowances paid) can be summarized as follows:

| Professional | Requested Expense | Prior Payment | Balance |
|---|---|---|---|
| Choate, Hall & Stewart (Atty's for general creditors' committee) | $13,266.49 | $13,266.49 | $0 |
| Choate, Hall & Stewart (Atty's for trustee) | $46,160.87 | $23,473.76 | $22,587.11 |
| Stephen B. Darr (Ch. 11 Trustee) | $ 3,266.00 | $ 3,266.00 | $0 |
| Goodwin, Procter & Hoar (Atty's for DIP/debtors) | $81,243.89 | $80,981.64 | $ 262.25 |
| Hunter & Walsh (Atty's for special committee) | $ 2,216.00 [3] | $ 2,216.00 | $0 |

The chapter 11 voluntary petitions in these cases were filed on October 22, 1990. The debtors' attempts to achieve a successful ongoing reorganization plan resulted in a joint reorganization plan filed on July 18, 1991, which was amended on September 16, 1991, but which did not result in approval of the requisite disclosure statement or any confirmation hearing on the debtors' joint plan. The Court by an Order to Show Cause entered October 29, 1991 set down a hearing as to why a chapter 11 trustee should not be authorized in view of the lack of progress on the debtors' plan, and on November 19, 1991 the Court at the resulting hearing made a bench ruling authorizing the appointment of a chapter 11 trustee which was followed by entry of a formal order to the same effect on December 5, 1991.

Following the appointment of the chapter 11 trustee, the proceedings went forward as the chapter 11 trustee developed a liquidation plan which ultimately was filed, in a final revised version, on November 30, 1995 and was confirmed on January 18, 1996.

The assets held by these debtors, which were ultimately liquidated under the chapter 11 trustee's liquidation plan, were comprised of some forty real estate properties of various types but primarily involved a number of sizeable, upscale, mobile home parks operated and located in New Hampshire and Vermont. The marketing and sale of these mobile home parks was complicated by certain state statutory provisions intended to protect the tenants of such parks from prejudice arising from sale, which created some novel legal questions in the bankruptcy context

**1.** This amount was previously allowed on a final basis by separate order but is restated here to provide an overall picture of the total fees and expenses claimed against these estates.

**2.** See footnote 1.

**3.** See footnote 1.

that ultimately were resolved as reflected in this Court's decision in *In re Rancourt,* 153 B.R. 380 (Bankr.D.N.H.1993).

■ Among other factors, the size and nature of the estate being administered is a pertinent factor for determination of reasonable compensation under § 330 of the Bankruptcy Code. In the case of the present debtors, the assets liquidated and the amount made available for distribution to creditors under the priorities established under the Bankruptcy Code (in numbers rounded for present purposes for simplicity) are as follows:

| Asset | Amount |
| --- | --- |
| Net amount turned over by debtors from mobile home park operations and miscellaneous other rental revenues. | $1,388,000.00 |
| Net revenues from mobile home park operations by chapter 11 trustee. | $1,127,000.00 |
| Net revenues from sales of mobile home parks and miscellaneous minor real property assets. | $2,966,000.00 |
| Litigation settlement with Mrs. Rancourt regarding assets and properties transferred to her shortly before bankruptcy. | $ 788,000.00[4] |
| Net proceeds from sale of 44 Broad Street, Nashua, New Hampshire real property which was subject to environmental remediation issues raised by EPA. | $ 150,000.00 |
| Anticipated tax refund from Internal Revenue Service. | $ 203,000.00 |
| Miscellaneous other revenues. | $ 41,000.00 |
| Subtotal | $6,663,000.00 |
| Interest on deposited funds | 366,000.00 |
| TOTAL | $7,029,000.00 |

If all pending final fee award requests are allowed in full as requested the resulting

actual cash flow and distribution to creditors from the proceeds of the liquidation of the assets of these estates would be as follows:

| | |
| --- | --- |
| NET LIQUIDATION ESTATE LESS | $7,029,000.00 |
| Estate taxes paid | (359,000.00) |
| Post confirmation fees paid per plan | (85,000.00) |
| Interim allowances previously paid on fees and expenses | (1,463,000.00) |
| Subtotal | $5,122,000.00 |
| Reserves for additional post-confirmation expenses per plan | (132,000.00) |
| Further payments on pending final fee and expense requests if allowed in full | (999,000.00) |
| AMOUNT AVAILABLE FOR DISTRIBUTION TO CREDITORS LESS | $3,991,000.00 |
| Priority wage claimants (Prepetition) | (3,000.00) |
| Priority consumer claims (Prepetition) | (16,000.00) |
| Priority tax claims (Prepetition) | (44,000.00) |
| NET AMOUNT AVAILABLE FOR GENERAL UNSECURED CREDITORS | $3,928,000.00 |

Since there are approximately $17,595,-000.00 in amount of general unsecured prepetition claims the resulting amount of $3,928,000 given above (assuming all final fee awards are allowed in full as requested) would result in a 22.33 percent dividend to the general unsecured creditors in these cases.

The foregoing analysis of these estates thus would show a total estate produced by liquidation of $7,029,000 and total administrative costs for that liquidation of $3,038,000.[5] These numbers would indicate a liquidation cost percentage of 43.21 percent of the estate produced by the professionals' services.

---

**4.** The actual settlement with Mrs. Rancourt provided for her payment of $1,038,000 but a separate settlement between the chapter 11 trustee and the FDIC (who arguably had a separate cause of action regarding the transfers against Mrs. Rancourt) provided that the FDIC would receive $250,000 from the settlement proceeds.

**5.** The $3,038,000 is comprised of the $359,000 of estate taxes referenced above; the $85,000 of postconfirmation expenses per the plan; the $132,000 of postconfirmation reserves referenced above; and $2,462,000 in total professional fees and expenses ($1,463,000 plus $999,000) if final fee requests are allowed in full.

That relatively high number by itself, even in the absence of any objections to the fee requests, would have caused this Court to review the entire record of the proceedings with special scrutiny to determine whether such costs were reasonable in the circumstances of the assets and liabilities involved in these estates.

Not reflected in the foregoing analysis and calculations of expenses is the sum of approximately $700,000 of expense that was paid with regard to the 44 Broad Street property in environmental remediation work which has been treated only as operating expense and/or sale expense with regard to that property. Since that property was indicated to have a value of approximately $500,000, with liens against the property well in excess of that amount, the $700,000 expenditure has raised some additional questions as to certain of the professional services provided these estates.

The greater part of the expenditure on 44 Broad Street came by virtue of a stipulation by the debtors-in-possession and the general creditors' committee at a September 1991 hearing that there was in fact an imminent danger to public health and safety from the condition of the property. (Transcript, 9/27/91, pp. 3–4, 30, 36–37, 43–44, 48, 53). The expenditure accordingly was authorized based on the stipulation, but was done so prior to a later determination by this Court, after a full evidentiary hearing, that the EPA had no factual basis to establish any specific, actual danger to the public from any asbestos fibers that might have become airborne from the 44 Broad Street property. See *In re Rancourt*, 144 B.R. 601, 603 (Bankr.D.N.H. 1992).

While the "law of the case" is established by this Court's orders regarding remediation expense with regard to the 44 Broad Street property, and would not justify any attempt to vacate those orders authorizing expenditures as to that property, the "law of the case" as to those expenditures arose from the

services of the professionals involved in these cases as they presented the matter for decision to the Court. Therefore their services resulting in the expenditure of approximately $700,000 for a property worth $500,000, with no attempt to abandon the same on a showing of no imminent and actual factual danger to the public from the site, *is* relevant to a determination of reasonable fees for those professional services.

Those matters will be dealt with separately in an opinion dealing with the final fee allowances to those professionals but for present purposes it can be noted that had a successful abandonment effort been undertaken, early in the case, and had it succeeded with some nominal cost for placement of gravel on the site in question to cover any imminent danger even arguably existing, it is possible that the net $3,928,000 in funds available for distribution to the general unsecured creditors could have been augmented by an additional amount of as much as $700,000 which would have produced a dividend of 26.30 percent to the general unsecured creditors of these estates.

The Court does not now find that that necessarily *would* have been the result of an aggressive attempt to abandon the 44 Broad Street property early but the failure of the professionals involved, representing the debtors-in-possession and the general creditors' committee, to even attempt to achieve that result by requiring the EPA to come forward with actual proof of imminent harm and danger to the public health from the 44 Broad Street property, sufficient to preclude abandonment under the decision in *Midlantic Bank v. New Jersey Dept. of Envt'l Protection*, 474 U.S. 494 n. 9, 106 S.Ct. 755 n. 9, 88 L.Ed.2d 859 (1986), *is* a relevant factor for determination of reasonable compensation for such professionals.[6]

Having reviewed the entire record of these chapter 11 proceedings, and having reviewed the applications for final fee awards and expense reimbursements and the objections

---

**6.** The compensation of the debtors-in-possession's attorneys also must be reviewed in light of the conflict in their duties between the interests of the individual debtor Rancourt and the inter-

ests of the bankruptcy estate then being controlled by Rancourt as a debtor-in-possession. See *Bankruptcy Code,* § 1107.

thereto, and being fully advised in the premises, it is accordingly hereby

ORDERED, ADJUDGED and DECREED as follows:

1. The chapter 11 trustee, Stephen B. Darr, is hereby allowed, on a final basis, reasonable compensation for actual and necessary services in that capacity of $500,000. After crediting the $295,000 already paid on an interim basis to the applicant the resulting balance of $205,000 may be paid pursuant to this order. The applicant is also authorized reimbursement of actual and necessary expenses of $3,266 which have already been paid, leaving no remaining balance to be paid.

2. The attorneys appointed for the chapter 11 trustee, Choate, Hall & Stewart, are hereby allowed, on a final basis, reasonable compensation for actual and necessary services in that capacity of $445,000. After crediting the $205,000 already paid on an interim basis to the applicant the resulting balance of $240,000 may be paid pursuant to this order. The applicants are also authorized reimbursement of actual and necessary expenses of $45,625.84 of which $23,473.76 has already been paid, leaving a balance of $22,152.08 to be paid.

3. The attorneys appointed to represent the General Creditors' Committee, Choate, Hall & Stewart, are hereby allowed, on a final basis, reasonable compensation for actual and necessary services in that capacity of $120,000 against which the amount of interim payment of $120,000 shall be credited leaving no further final fees to be paid at this time. The applicants are also authorized reimbursement of actual and necessary expense of $13,266.49 of which $13,266.49 has already been paid, leaving no further expenses to be paid. The reasons why this Court determines that no further allowance should be granted on the pending fee application by these applicants are set forth in the Memorandum Opinion entered separately this date.

4. The attorneys appointed as counsel to the Official Special Committee of Creditors, Hunter & Walsh, have previously been allowed, on a final basis, reasonable compensa-

tion for actual and necessary services in that capacity of $96,201 (Ct. Docket No. 1055). These applicants were also authorized under the separate order reimbursement of actual and necessary expenses of $2,216.00 which have already been paid, leaving no remaining balance to be paid.

5. The attorneys representing the debtors and also appointed for the debtors-in-possession, Goodwin, Procter & Hoar, are hereby allowed, on a final basis, reasonable compensation for actual and necessary services in those capacities of $460,000. After crediting the $442,600 already paid on an interim basis to these applicants the resulting balance of $17,400 may be paid pursuant to this order. These applicants are also authorized reimbursement of actual and necessary expenses of $81,243.89. After crediting the $80,981.64 already paid on an interim basis to the applicants the resulting balance of $262.25 may be paid pursuant to this order. The reasons why this Court determines that no additional allowance should be granted on the pending fee application by these applicants are set forth in the Memorandum Opinion entered separately this date.

6. The attorneys appointed as special counsel to the debtors-in-possession, Boutin & Solomon; Michels & Michels; Stephen Wyman; and Melanson, Greenwood, have previously been allowed, on a final basis, reasonable compensation for actual and necessary services in that capacity of $209,712.20 (See Ct. Docket No. 1029, p. 5).

7. The foregoing final fee awards and expense reimbursement allowances total $1,976,531.42, which this Court hereby determines to be reasonable in amount for actual and necessary services rendered to these estates by the professionals involved in terms of the size and nature of the estates involved, the results produced, and all other factors pertinent pursuant to § 330 of the Bankruptcy Code. These final fee awards and allowances will require a net actual cash flow to be paid now to these professionals of $484,-814.33. Deducting these net payments to the professionals pursuant to this order will result in an estate available for distribution to general creditors of approximately $4,442,000 and will produce a dividend of approximately

25.25 percent to such creditors. The Court determines that those total liquidation costs to achieve this result is appropriate in the circumstances of these cases.

DONE and ORDERED this 7th day of February, 1997 at Manchester, New Hampshire.

/s/ James E. Yacos
JAMES E. YACOS
BANKRUPTCY JUDGE